2021 IL App (1st) 200830-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
December 21, 2021

No. 1-20-0830

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| IMAGE MEDIA ADVERTISING, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 15 CH 2072 |
| | ) | |
| ILLINOIS DEPARTMENT OF TRANSPORTATION, | ) | The Honorable |
| | ) | Celia G. Gamrath, |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held:*   Trial court's entry of summary judgment in favor of Illinois Department of Transportation is affirmed, where sign erected by plaintiff on the side of a building was not a lawful nonconforming registered sign, and plaintiff was not entitled to the transfer of permit that had been issued to a prior party to erect a sign at the same location.

¶ 2   The plaintiff, Image Media Advertising, Inc., appeals the trial court's order granting summary judgment against it and in favor of the defendant, the Illinois Department of Transportation (IDOT), and declaring that an illuminated vinyl sign that the plaintiff had erected on the west wall of a building located at 1223 West Chestnut Street in Chicago was neither a lawfully registered nor permitted sign under the provisions of the Highway Advertising Control Act of 1971

(Advertising Control Act) (225 ILCS 440/1 *et seq*. (West 2020)) and that the plaintiff was not entitled to the renewal or transfer of a previously-issued permit to erect a sign on the building's wall. For the reasons that follow, we affirm the trial court's entry of summary judgment in favor of IDOT and against the plaintiff.

¶ 3                                                    I. BACKGROUND

¶ 4         Visible to drivers traveling southbound on the Kennedy Expressway, the west wall of the building at 1223 West Chestnut Street in Chicago has been used for the displaying of advertisements since at least the early 1960s. As such, it was eligible to be grandfathered as a lawful nonconforming sign when Congress enacted the Highway Beautification Act of 1965 (23 U.S.C. § 131 *et seq.* (1970)) and Illinois enacted the Advertising Control Act, which went into effect on July 1, 1972. See Pub. Act 77-1815 (eff. July 1, 1972). Both of these statutory enactments were directed at controlling outdoor advertising signs along the Interstate highway system.

¶ 5         In 1972, the company that then leased the wall for advertising purposes (Foster & Kleiser) submitted to IDOT an application for the registration of an outdoor advertising sign. This was done pursuant to section 8 of the Advertising Control Act, which required each existing sign to be "registered" with IDOT within 90 days of the statute's effective date. See Ill. Rev. Stat. 1973, ch. 121, § 508. The application described the sign type as a "[p]ainted [w]all." The application identified Foster & Kleiser as the "Owner of Sign" and the building's then-owner as the "Owner of Land." IDOT approved the registration as number 1-3520 and issued a registration tag that was affixed to the wall.

¶ 6         In 1980, the lease that Foster & Kleiser had to advertise on the wall ended, and the building's owner entered into a new lease with Kendon T. Birchard d/b/a Jaguar Company (Jaguar Company) for use of the building's west wall "for the purpose of erecting and maintaining advertising signs

thereon." The lease further provided that its effectiveness was "subject to Jaguar Company's ability to obtain all necessary permits, approvals, or licenses from any and all government units having jurisdiction over the use of outdoor advertising displays," and that if Jaguar Company was "unable to obtain any such necessary permit, approval, or license Jaguar Company shall give notice to Lessor and this lease shall become null, void, and of no further force or effect."

¶ 7        After leasing the right to erect and maintain advertising signs on the building's west wall, Jaguar Company apparently did not rely on the sign's 1973 registration as the legal basis for its continued maintenance of a sign on the building's wall. Instead, on March 24, 1980, Jaguar Company submitted to IDOT an application "for a permit to erect an outdoor advertising sign."[1] The application described the proposed sign as an "illuminated wall sign," 77 feet wide and 28 feet tall, 700 feet from the nearest existing or proposed sign, with the vertical supports described as "wall" and the sign face described as "brick." The application identified Jaguar Company as the "Owner of Proposed Sign" and the building's then-owners as the "Owner of Land." On June 20, 1980, IDOT approved Jaguar Company's application and issued permit number 1-1289. It appears to be undisputed that IDOT approved this application in 1980 despite the fact that the sign did not satisfy the size or spacing requirements allowable under the statute or IDOT regulations.

¶ 8        After 1980, Jaguar Company's lease of the right to advertise on the west wall was extended from time to time, though 2014. The record includes another written lease from 1994, providing that Jaguar Company was agreeing to lease the building's west wall "for the purpose of maintaining advertising signs thereon, and other appurtenances thereon." The 1994 lease contained

---

[1] It would appear that Jaguar Company did this to conform with the requirement of section 8 of the Advertising Control Act that, "[u]pon change of sign ownership the new owner of the sign shall notify the Department and supply the necessary information to renew the permit for such sign at no cost within 60 days after the change of ownership. Any permit not so renewed shall become void." Ill. Rev. Stat. 1979, ch. 121, ¶ 508 (now codified at 225 ILCS 440/8 (West 2020)).

the same provision as the 1980 lease concerning its effectiveness being subject to "Jaguar Company's ability to obtain all necessary permits, approvals, or licenses from any and all governmental units having jurisdiction over the use of outdoor advertising displays."

¶ 9    From the sign's inception in the 1960s through approximately 2000, the method by which advertising was displayed on the wall was by painting that advertisement directly onto the brick wall. At some point in approximately 2000, this method changed. The advertising was no longer painted directly onto the brick, but instead the advertisement was preprinted onto a vinyl banner or "substrate" that was affixed or attached to the wall in some fashion. No new permit from IDOT was obtained when this change occurred.

¶ 10    In 2014, attorneys for the building's owners notified Jaguar Company that its lease of the west wall would not be renewed when it expired on November 15, 2014. Accordingly, on September 16, 2014, the building's owners entered into a new lease with the plaintiff for the west wall of the building "for the purposes of erecting, constructing, operating, maintaining, repairing, replacing, repositioning, altering, improving, supplementing, and illuminating an outdoor advertising structure or structures." The lease further provided that the plaintiff shall "secure all permits which may be necessary from" IDOT for "the continued use of the Ad Display Area." It provided that upon the expiration or termination of the lease, the plaintiff would transfer to the building's owners all permits and approvals that the plaintiff had obtained, including from IDOT, for consideration.

¶ 11    On September 22, 2014, the plaintiff submitted to IDOT a request to transfer permit 1-1289 from Jaguar Company to the plaintiff. The cover letter stated that the lease between the building's owners and Jaguar Company had ended and that the plaintiff had entered into a new lease of the wall. Copies of a letter terminating Jaguar Company's lease, along with copies of the leases

themselves, were enclosed. Also enclosed was IDOT form number LA 9009, titled "Transfer of Outdoor Advertising Permit Ownership." That form listed Jaguar Company as the "Former Sign Owner" and the plaintiff as the "Current Sign Owner." The form contained the signature of the plaintiff's principal certifying that the plaintiff "now has ownership of the subject permit(s)," but it contained no signature by anyone on behalf of Jaguar Company certifying that Jaguar Company "no longer owns the subject permit(s)." Unlike other lines on the form, the line for the signature of the former owner was not marked as a "required" field.

¶ 12         On October 14, 2014, the plaintiff's principal sent a second letter to IDOT, referencing a phone conversation that had occurred several days earlier. The letter set forth in greater detail the plaintiff's position that it qualified for the transfer of the permit that had been previously issued to Jaguar Company. One of the exhibits to the plaintiff's letter was a separate letter, sent by IDOT to Jaguar Company and dated September 26, 2014, informing Jaguar Company that if it relinquished permit 1-1289, IDOT would not be able to issue a new permit on that property to Jaguar Company or to any other party, because a sign there would not meet current standards of compliance with the Highway Beautification Act or Advertising Control Act. According to the plaintiff's letter of October 14, Jaguar Company had agreed to sell and assign its permit to the plaintiff for an amount less than $30,000 but changed its position and demanded $300,000 after learning of IDOT's position in the September 26 letter.

¶ 13         No agreement was ever reached between the plaintiff and Jaguar Company for the transfer of permit 1-1289. On November 14, 2014, Jaguar Company's principal sent an email to IDOT formally requesting cancelation of permit 1-1289 effective that day.

¶ 14         On November 15, 2014, Jaguar Company removed the vinyl sign and lighting that it had attached to the west wall of the building. Later that day, the plaintiff attached its own sign to the

wall. The sign that the plaintiff attached to the wall was "a computer-generated single substrate piece of vinyl" that was the same size as the sign that had just been removed from the wall.

¶ 15     On November 17, 2014, IDOT sent a letter to Jaguar Company acknowledging receipt of its letter cancelling permit 1-1289. That letter stated that the permit would be revoked 30 days later for the reasons that (1) Jaguar Company no longer had a valid site lease, (2) the site was within 500 feet of another registered conforming sign, and (3) the sign was 2,156 square feet and thus exceeded the applicable size limits for signs.

¶ 16     On November 18, 2014, IDOT sent a letter to the plaintiff denying the plaintiff's request that Jaguar Company's permit 1-1289 be transferred to the plaintiff. According to IDOT's letter, the plaintiff's submission was deficient because it did not include the necessary information to establish that a change in ownership in the sign or permit had occurred. Specifically, it stated that the plaintiff had not supplied an agreement between itself and the record owner showing a transfer of ownership or obtained the signature of the record owner on the submitted form. Without one of the forms of evidence that a change of ownership had occurred, the permit would not be transferred to the plaintiff and placed in its name.

¶ 17     On January 16, 2015, IDOT sent a letter to the plaintiff stating that its sign on the west wall of the building had been "erected illegally without a valid permit" and was therefore unlawful. It notified the plaintiff that its sign had to be removed within 30 days or it would become the property of IDOT and removed by IDOT at the plaintiff's expense.

¶ 18     On February 6, 2015, the plaintiff filed a complaint for declaratory judgment and injunctive relief against IDOT in the circuit court. In its operative amended complaint, the plaintiff sought a declaratory judgment that the wall sign "was lawfully registered with IDOT and does not require a permit to display advertising or be maintained as a 'sign' under the [Advertising Control] Act"

and that the plaintiff "is entitled to immediate renewal or transfer of Permit No. 1-1289 to its name." A temporary restraining order was later entered prohibiting IDOT from taking any action to remove the sign at issue.

¶ 19    After conducting discovery, on February 4, 2019, the parties filed cross-motions for summary judgment. The plaintiff argued in its motion that it was entitled to summary judgment for the reasons that (1) the wall sign had been properly registered in 1973 and thus the plaintiff could continue to operate it as a registered sign, and (2) the paperwork submitted by the plaintiff to IDOT should have resulted in IDOT's transferring of permit 1-1289 to the plaintiff. By contrast, IDOT argued that it was entitled to summary judgment because (1) the sign's registration was no longer valid once Foster & Kleiser lost access to the site in 1980 and Jaguar Company thereafter applied for a permit, and (2) the plaintiff had no right to permit 1-1290 because Jaguar Company had never agreed to sell or transfer the permit to the plaintiff and merely leasing access to the wall did not give the plaintiff ownership of the "sign."

¶ 20    The cross-motions were briefed, and the trial court conducted oral argument. During that oral argument, the trial court questioned the attorneys about the effect on the wall's registration of the change from painting the advertising directly onto the brick to attaching a preprinted vinyl banner to the wall. The court questioned whether this change constituted the "erection" of a new sign under the Advertising Control Act, as opposed to the "maintaining" of a preexisting sign. See 225 ILCS 440/3.06, 3.08 (West 2020). The court also questioned the effect of the addition of lighting to the wall. Following the hearing, the trial court entered an order allowing the parties to submit case law or materials to support whether there was a difference between a painted wall sign and an affixed vinyl or illuminated sign for purposes of determining whether such change constituted the "erection" of a new sign. The court declined the plaintiff's request to reopen the proofs on

whether the original sign was illuminated, but it allowed the parties to point out where the issue had been addressed in the existing record. Both parties then submitted case law and statutory citations in conformance with the trial court's order.

¶ 21      On July 21, 2020, the trial court entered a written order granting summary judgment in favor of IDOT and against the plaintiff. The trial court further declared that the plaintiff's illuminated vinyl sign erected on the west wall of the building at issue was neither a lawfully registered nor permitted sign, and that the plaintiff was not entitled to the renewal or transfer of permit 1-1289. As to the plaintiff's argument that it was entitled to the transfer of the permit, the trial court found that (1) the permit did not stay with the wall as opposed to the sign owner, which was Jaguar Company, (2) because Jaguar Company refused to sell or transfer ownership of the sign or permit to the plaintiff, and had instead canceled the permit and removed its existing sign, the plaintiff was unable to provide IDOT with the information necessary to obtain transfer of the permit, (3) IDOT had the right to require the signature of a previous sign owner confirming that a new person or entity owned the sign or permit, and (4) the building's owner could not be considered the owner of permit 1-1289.

¶ 22      As to the plaintiff's argument that it was entitled to rely on the sign's 1973 registration as a basis for displaying a sign on the wall, the trial court found that, to keep its grandfathered status as a lawful nonconforming sign, the wall had to remain substantially the same as it was in 1972. The court found that the plaintiff's vinyl sign bore no resemblance to the sign that had been registered in 1973, which was an unilluminated painted brick wall. The court found that Jaguar Company had not relied upon the 1973 registration, but instead it obtained its own permit to erect an illuminated wall sign. When Jaguar Company later canceled its permit and removed its sign and lights, all that was left was a brick wall displaying no advertising message. The court reasoned

that changing the means of advertising from painting a brick wall to affixing a vinyl banner onto the wall and adding lights was not incident to a mere change in advertising message, nor was it normal maintenance or repair. Instead, the court found it was the erection of an entirely new sign with illumination, a different sign face, a different means of fastening, and a different medium of advertising, and thus it constituted the "erection" of a new sign. The trial court found no legislative intent that registered signs be allowed to exist in perpetuity, but rather that the intent was that nonconforming signs be phased out over time.

¶ 23    The plaintiff thereafter filed a timely notice of appeal, and this appeal followed.

¶ 24                                      II. ANALYSIS

¶ 25    On appeal, the plaintiff argues that the trial court erred in granting summary judgment in favor of IDOT. The plaintiff's principal argument is that the undisputed facts show that the sign at issue was registered in 1973, and thereafter the sign was never abandoned, destroyed, or materially changed. For this reason, the plaintiff contends, it can be concluded as a matter of law that the sign's registration remained valid through the time when the plaintiff's lease of the rights to advertise on the wall began in 2014, and the plaintiff could rely on the wall's 1973 registration as permission for it to display advertising on the wall. The plaintiff also makes several alternative arguments. First, it argues that genuine issues of material fact exist, specifically about the time at which lighting was added to the wall. Second, the plaintiff argues that the issue of the addition of lighting was raised by the trial court *sua sponte*, and the trial court erred by not allowing additional evidence or argument on the matter. Finally, the plaintiff argues it was entitled to have the permit issued for the sign in 1980 transferred to it, regardless of whether Jaguar Company consented to the permit's transfer.

¶ 26                                  A. Standard of Review

¶ 27    Before proceeding to the merits, we address IDOT's argument that this court must review this case according to standards applicable in administrative review proceedings. In the trial court, this case was filed and pended as an action for declaratory judgment and for injunctive relief. IDOT never challenged the applicability of these theories of relief relied upon by the plaintiff. For the first time on appeal, however, IDOT has taken the position that the only legal theory under which relief was available to the plaintiff was the common law writ of *certiorari*, because the plaintiff sought review of IDOT's decision not to transfer a permit for an outdoor advertising sign. IDOT thus urges this court to resolve the appeal as if the trial court had made a ruling upon a petition for writ of *certiorari*.

¶ 28    The common law writ of *certiorari* provides a method by which a petitioner without an avenue for appeal or direct review of an action by a tribunal exercising quasi-judicial functions could obtain limited review of such action. *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 427 (1990). Under the writ, the entire record of the inferior tribunal is brought before the circuit court so that it may determine, from that record alone, whether the tribunal proceeded according to applicable law. *Id.* If the circuit court, upon return of the writ, finds from the record that the inferior tribunal proceeded according to law, the writ is quashed. *Id.* By contrast, if the court finds that the proceedings were not in conformance with law, the judgment and proceedings shown by the return will be quashed. *Id.* In situations where an applicable statute does not expressly adopt the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)), the common law writ of *certiorari* serves as an available method for reviewing the actions of agencies and tribunals exercising administrative functions. *Stratton*, 133 Ill. 2d at 427. It is undisputed that the statute at issue here, the Advertising Control Act (225 ILCS 440/1 *et seq.* (West 2020)), does not adopt the Administrative Review Law.

¶ 29    The effect of accepting IDOT's argument in this case would be that, instead of reviewing the trial court's granting of summary judgment under a *de novo* standard, we would be reviewing IDOT's decision not to transfer the permit under a more deferential standard of review applicable to administrative agency decisions. See *Lipscomb v. Housing Authority of County of Cook*, 2015 IL App (1st) 142793, ¶¶ 11, 14-15. Further, our review would be limited to the record of the administrative proceedings, and it would not include the affidavits, depositions, and other evidence that is included in the record on appeal as developed in the trial court. *Id.* ¶ 11. Finally, IDOT asserts that it would also preclude us from reaching any issues concerning the effect of the sign's 1973 registration, because the plaintiff did not raise the issue of the sign's registration prior to filing this case in the trial court, and thus it was never the subject of a final agency determination.

¶ 30    In support of its argument, IDOT relies upon *Outcom, Inc. v. Illinois Department of Transportation*, 233 Ill. 2d 324 (2009), which also involved the Advertising Control Act. In *Outcom*, the plaintiff, which was in the business of outdoor advertising, submitted applications to IDOT for permits to erect two billboards at a site along an Interstate highway. *Id.* at 328. As it was required to do by regulation, IDOT issued an "intent to deny" notifying the plaintiff that it intended to deny its permit applications on the basis that the plaintiff had not shown that a temporary trailer on the same site, which served as a transmitter and ground system for a radio station, was not a commercial or industrial site within the meaning of IDOT's regulations. *Id.* at 329-30. In response, the plaintiff sent a letter to IDOT with additional information challenging its intent to deny the permits. *Id.* at 330. IDOT then denied the permit applications. *Id.* Thereafter, the plaintiff filed a complaint in circuit court seeking a declaratory judgment that, *inter alia*, IDOT's denial of its permit applications was improper, as well as a writ of *mandamus* commanding IDOT to issue the permits. *Id.* at 331. The trial court granted summary judgment in favor of the plaintiff, issued the

declaratory judgment the plaintiff sought, and ordered IDOT to grant the applications. *Id.* at 332.

¶ 31 The supreme court began by addressing the applicable standard of review, including the procedural posture of the case and "the reviewability of IDOT's decision." *Id.* It noted that the Advertising Control Act had not adopted the Administrative Review Law or provided any other method by which to review a decision by IDOT to deny a permit application. *Id.* at 333. The court further noted that IDOT, pursuant to its statutory authority to establish regulations regarding the implementation and enforcement of the Advertising Control Act (225 ILCS 440/14.01 (West 2006)), had adopted a regulation stating, " 'No appeal may be taken from the District's decision on the challenged application.' " *Outcom*, 233 Ill. 2d at 334 (quoting 92 Ill. Adm. Code § 522.80(a), amended at 30 Ill. Reg. 15792 (eff. Oct. 1, 2006)). The court concluded that this regulation's language meant only that no further appeal or review would be allowed before the agency, not that the regulation precluded court review of the agency's decisions. *Id.* at 335.

¶ 32 The supreme court went on to state that IDOT had "implicitly recognized that its permit denial was reviewable" through the method of a common law writ of *certiorari*. *Id.* It then addressed the fact that the plaintiff had not filed a common law writ of *certiorari*. Instead, it had filed a complaint for declaratory judgment and for writ of *mandamus*, and IDOT had not challenged the plaintiff's use of those methods in the trial court. *Id.* at 336. The court explained that, "[i]rrespective of whether IDOT forfeited review of this issue" (as the appellate court had found it did), "our case law is clear that the circuit courts 'do not possess greater authority to review actions by agencies whose final decisions are reviewable through common law methods than the courts have when statutory procedures apply.' " *Id.* at 336-37 (quoting *Dubin v. Personnel Board of the City of Chicago*, 128 Ill. 2d 490, 498 (1989)). "Consequently, although this case comes to us following the affirmance of summary judgment on plaintiff's complaint for declaratory relief

and a writ of *mandamus,* we will treat this appeal as we would any other appeal that comes to us on administrative review." *Id.* at 337.

¶ 33    In response to IDOT's arguments, the plaintiff argues that IDOT has forfeited the argument that this case should be treated as an administrative review matter. The plaintiff notes that IDOT allowed this case to pend for years in the trial court as an action for declaratory judgment and injunctive relief without ever raising the issue that the plaintiff had sought an improper or unavailable remedy. The plaintiff argues that IDOT should not now be allowed to argue that review is limited to the administrative record, because IDOT never filed such an administrative record in the trial court and its failure to do so would cause significant prejudice to the plaintiff. Further, IDOT also allowed an extensive record to be developed in the trial court and relied upon by the parties and trial court in its ruling.

¶ 34    The plaintiff further points out that, even before a case was filed in the trial court, IDOT did not treat its denial of the plaintiff's request to transfer Jaguar Company's permit as a situation subject to its own regulations involving agency review of the denial of a permit application. See 92 Ill. Adm. Code § 522.80, amended at 35 Ill. Reg. 8523 (eff. May 11, 2011). Those regulations require IDOT, if it intends to deny a permit application, to notify the applicant of that intent, state the reasons for the denial, and inform the applicant that it has 30 days to challenge the intent to deny or correct the deficiencies noted. *Id.* § 522.80(a). The plaintiff points out that IDOT did not follow this procedure when it denied the transfer of Jaguar Company's permit to the plaintiff. The plaintiff argues that fact this distinguishes this case from *Outcom*, which involved the denial of a permit that proceeded according to this process. See *Outcom*, 233 Ill. 2d at 328-31.

¶ 35    Finally, the plaintiff argues that a declaratory judgment was an appropriate means to review the issues of this case because IDOT's actions were quasi-legislative, not quasi-judicial. Quasi-

judicial hearings are those that concern agency decisions affecting a small number of people on individual grounds, based upon a particular set of disputed facts that have been adjudicated. *Brown v. Duncan*, 361 Ill. App. 3d 125, 131 (2005). Accordingly, judicial review of a quasi-judicial hearing generally can occur only where there has been a final agency determination, usually following some sort of adversarial proceeding, a hearing on the controverted facts, and an ultimate disposition rendered by an impartial factfinder. *Id.* However, administrative agencies may also exercise quasi-legislative functions that are not subject to review pursuant to writ of *certiorari*. *Id.* Instead, quasi-legislative actions of an administrative agency can be reviewed in a declaratory judgment action if it is alleged that the action is unlawful. *Id.*

¶ 36 The plaintiff argues that this case is similar to *Brown*, in which this court held that a declaratory judgment, not *certiorari*, was an appropriate method by which to review whether the refusal of the Board of Education of the City of Chicago to ratify the contract of a proposed elementary school principal violated the Illinois School Code (105 ILCS 5/1-1 *et seq.* (West 2002)). *Brown*, 361 Ill. App. 3d at 126-27. The basis for the board's refusal to ratify the contract was that several members of the local school council who had voted for the principal's appointment were allegedly not valid members of the school council. *Id.* at 128. Significant to the court's holding was the fact that the board had made its determination without conducting any form of adjudicatory or other hearing. *Id.* at 133. The court also noted that the board's decision was not truly final. *Id.* The court thus found the board's actions "more akin to a quasi-legislative action than it was to a quasi-judicial action," and therefore held that declaratory relief, not *certiorari*, was the appropriate remedy for review. *Id.*

¶ 37 We agree with the plaintiff that IDOT has forfeited the argument that this court should resolve this appeal as if the trial court had made a ruling upon a petition for writ of *certiorari*, instead of

reviewing the trial court's ruling on summary judgment in an action for declaratory and injunctive relief. IDOT allowed this case to pend for over five years in the trial court without objecting to the appropriateness of the remedies sought or arguing that the case needed to be treated as a petition for writ of *certiorari*. Issues not raised in the trial court are forfeited, and this includes challenges to the remedy sought by the plaintiff. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶¶ 13-15. Here, IDOT is seeking to have this case reviewed as if it had been a petition for writ of *certiorari*, which involves the entire record of an administrative agency being brought before the trial court and the trial court's determination, from that administrative record alone, whether the agency proceeded according to applicable law. *Stratton*, 133 Ill. 2d at 427. IDOT's failure to raise this argument in the trial court means that no administrative record was ever brought before that court in this case. If we accepted IDOT's argument, we fail to see how the appellate court could do any more than guess about would have been included in an administrative record if it had existed.

¶ 38 Furthermore, the plaintiff's point regarding IDOT's pre-suit failure to follow its own regulations concerning agency review is well-taken. See 92 Ill. Adm. Code § 522.80, amended at 35 Ill. Reg. 8523 (eff. May 11, 2011). Because IDOT never put the plaintiff on notice that it considered its refusal to transfer Jaguar Company's permit as something subject to its review regulations, the plaintiff could not fairly be charged with recognizing the importance of availing itself of the agency review process or of ensuring a sufficient administrative record was created. Finally, we note that, similar to *Brown*, wherein we recognized that declaratory judgment (not *certiorari*) was an appropriate remedy, IDOT never conducted any form of adjudicatory hearing or other hearing in this case. *Brown*, 361 Ill. App. 3d at 133. For all of these reasons, we reject the argument of IDOT that this appeal must be resolved according to standards applicable in

administrative review proceedings. Instead, our review will be of whether the trial court properly granted summary judgment in favor of IDOT and against the plaintiff.

¶ 39   Accordingly, summary judgment is appropriately granted if the pleadings, depositions, admissions, and affidavits on file establish that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2020). A court construes the pleadings, depositions, admissions, and affidavits strictly against the movant and considers the motion for summary judgment in the light most favorable to the nonmoving party. *Gillespie v. Edmier*, 2020 IL 125262, ¶ 9. In a case where parties file cross-motions for summary judgment, they agree that only questions of law are involved and invite the court to decide the issues based upon the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. This court's review of an order granting summary judgment is *de novo*. *Id.* ¶ 30.

¶ 40                    B. Plaintiff's reliance on sign's 1973 registration

¶ 41   As stated above, the plaintiff's principal argument on appeal is that the trial court erred by granting summary judgment in favor of IDOT because the sign at issue was registered in 1973, it was never abandoned, destroyed, or materially changed thereafter, and as a matter of law its registration remained valid through 2014 and could serve as the basis for the plaintiff to display advertising content on the wall. The trial court ruled that the plaintiff could not rely upon the 1973 registration of the sign as a basis for its displaying of advertising on the wall in 2014 because the plaintiff's sign was not substantially the same as the sign had been at the time of its registration. Specifically, the court relied upon the facts that (1) the sign registered in 1973 was a non-illuminated sign painted on a brick wall, (2) Jaguar Company had applied for and obtained a permit in 1980 that allowed it erect a new sign on the wall, and (3) the existing sign was then completely changed and covered up in the late 1990s when Jaguar Company affixed a vinyl sign to the wall.

The trial court found no legislative intent that registration of a sign would serve as a basis for allowing a nonconforming sign to exist in perpetuity.

¶ 42    The plaintiff's argument presents issues of statutory interpretation, specifically the continuing effect of the registration of a sign in existence at the time of the passage of the Advertising Control Act (225 ILCS 440/1 *et seq.* (West 2020)). When interpreting statutes, this court's primary objective is to ascertain and effectuate the intent of the legislature. *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 24. That intent is best determined from the plain and ordinary meaning of the language used in the statute. *Id.* Where a statute includes definitions of the terms it uses, those terms will be interpreted according to their statutory definitions, but in the absence of such definitions, the words of a statute are given their plain and ordinary meanings. *Houlihan v. City of Chicago*, 306 Ill. App. 3d 589, 594 (1999). The statute is viewed as a whole, with words and phrases interpreted in context to other relevant statutory provisions and not in isolation. *Oswald v. Hamer*, 2018 IL 122203, ¶ 10. Additionally, we may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of interpreting the statute one way or the other. *Better Government Ass'n v. Illinois High School Ass'n*, 2017 IL 121124, ¶ 22. The interpretation of a statute by the agency charged with its administration is also generally given deference, but an agency's interpretation is not binding on the court and will be rejected if it is erroneous. *Prazen v. Shoop*, 2013 IL 115035, ¶ 40.

¶ 43    The Advertising Control Act went into effect in Illinois on July 1, 1972, in response to the enactment by Congress of the Highway Beautification Act (23 U.S.C. § 131 *et seq.* (1970)). See *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 170 (1992). The Highway Beautification Act required states to make provisions for the "effective control" of the erection and maintenance of outdoor advertising signs, displays, and devices along the Interstate highway system or risk a 10%

reduction in federal highway funds otherwise available. 23 U.S.C. § 131(b) (1970). The federal regulations effectuating the Highway Beautification Act contemplated that states could allow a sign that was "lawfully in existence" at the time a new state law became effective to "remain even though it may not comply with the size, lighting, or spacing criteria" applicable under the new state law or regulation. 23 C.F.R. § 750.707(c) (1976). However, the federal regulation went on to provide that such a provision "only allows an individual sign at its particular location for the duration of its normal life subject to customary maintenance." *Id.* Also, "[t]he sign must remain substantially the same as it was on the effective date of the State law or regulations." *Id.* § 750.707(d)(5). Reasonable repair and maintenance, as well as the changing of advertising message, does not terminate "nonconforming rights." *Id.* The preexisting sign may continue as long as it is not destroyed, abandoned, or discontinued, under criteria as developed by the state for determining whether destruction, abandonment, or discontinuation has occurred. *Id.* § 750.707(d)(6).

¶ 44    To this end, the Advertising Control Act regulates the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to Interstate highways and primary highways in Illinois. 225 ILCS 440/1 (West 2020). Among its provisions are criteria for the size, lighting, and spacing of outdoor advertising signs. *Id.* §§ 6.01, 6.02, 6.03. It further contemplates that IDOT may establish rules and regulations to implement and enforce the statute. *Id.* § 14.01. Pertinent to this appeal is its section 8, which at the time of enactment stated as follows:

> "Within 90 days after the effective date of this Act, each sign, except signs described by Section 4.01 and signs along primary highways described by Sections 4.02 and 4.03, must be registered with the Department by the owner of the sign, on forms obtained from the Department. The Department shall require reasonable information to be furnished,

including the name of the owner of the land on which the sign is located and a statement that the owner has consented to the erection or maintenance of the sign. Registration must be made of each sign and shall be accompanied by a registration fee of $5.

No sign, except signs described by Section 4.01, and signs along primary highways described by Sections 4.02 and 4.03, may be erected after the effective date of this Act without first obtaining a permit from the Department. The application for a permit shall be on a form provided by the Department and shall contain such information as the Department may reasonably require. Upon receipt of an application containing all required information and appropriately executed and upon payment of a fee of $5, the Department then issues a permit to the applicant for the erection of the sign, provided such sign will not violate any provision of this Act.

Upon change of sign ownership the new owner of the sign shall notify the Department and supply the necessary information to renew the permit for such sign at no cost within 60 days after the change of ownership. Any permit not so renewed shall become void.

Owners of registered signs shall be issued an identifying tag, which must be securely affixed to the front face of the sign or sign structure in a conspicuous position by the owner within 60 days after receipt of the tag; owners of signs erected by permit shall be issued an identifying tag, which must be securely affixed to the front face of the sign or sign structure in a conspicuous position by the owner upon completion of the sign erection or within 10 days after receipt of the tag, whichever is the later." Ill. Rev. Stat. 1973, ch. 121, § 508.

Although section 8 has been amended several times since 1972, the statutory language pertinent to this appeal remains in effect today. See 225 ILCS 440/8 (West 2020).

¶ 45          Thus, the pertinent requirements of section 8 are that (1) each sign be registered with IDOT

by the owner of the sign, and (2) no "sign" may be "erected" after July 1, 1972, without first obtaining a permit from IDOT. Under this statute, it is generally accepted that signs that were in existence as of July 1, 1972, and that are registered with IDOT may remain in place regardless of their nonconformance with the Advertising Control Act's requirements. See *Dusty's Outdoor Media, LLC v. Department of Transportation*, 2019 IL App (5th) 180269, ¶ 3; see also 92 Ill. Adm. Code § 522.20 (defining "non-conforming sign"), amended at 35 Ill. Reg. 8523 (eff. May 17, 2011). No permit is required for such a pre-existing registered sign simply to be "maintained," which by statutory definition means that the sign is allowed to exist, that its advertising message may be periodically changed, and that it may undergo normal maintenance or repair of the sign and sign structure. 225 ILCS 440/3.06 (West 2020); *Dusty's Outdoor Media*, 2019 IL App (5th) 180269, ¶ 12; see also *Department of Transportation v. Keller Development Corp.*, 122 Ill. App. 3d 1038, 1040 (1984) (applying former statutory language to hold preexisting registered sign damaged in storm could be reconstructed without losing its lawful nonconforming status). However, a permit is required under section 8 if any change is made to a preexisting registered sign that goes beyond "maintenance" and instead meets the statutory definition of "erecting" a "sign."

¶ 46     The current statutory definitions of "sign" and "erect" provide in pertinent part as follows:

>      " 'Sign' means any outdoor sign, display, device, notice, figure painting, drawing, message, placard, poster, billboard, or other thing, which is designated, intended, or used to advertise or inform, and of which any part of the existing or intended advertising or informative contents is or will be visible from any place on the main-traveled way of any portion of an Interstate or primary highway and which is within 660 feet of the nearest edge of the right-of-way of such highway. * * *" 225 ILCS 440/3.07 (West 2020).

- 20 -

" 'Erect' means to construct, build, raise, assemble, place, affix, attach, create, paint, draw or in any other way bring into being or establish; but does not include any of the foregoing activities when performed as an incident to the change of advertising message or normal maintenance or repair of a sign or sign structure. *For the purposes of this definition, the following shall not constitute normal maintenance or repair of a sign or sign structure: replacing more than 60% of the uprights, in whole or in part, of a wooden sign structure; replacing more than 30% of the length above ground of each broken, bent, or twisted support of a metal sign structure; raising the height above ground of a sign or sign structure; making a sign bigger; adding lighting; or similar activities that substantially change a sign or make a sign more valuable.*" (Emphasis added). *Id.* § 3.08.

Prior to 2010, the definition of "erect" included only the first sentence above. The second sentence, set forth in italics in the definition above, was added that year. See Pub. Act 96-919, § 5 (eff. June 9, 2010) (amending 225 ILCS 440/3.08).

¶ 47        Against this statutory backdrop, the plaintiff's argument is that a registration "stays with the sign" until the sign is destroyed, abandoned, discontinued, removed, or modified beyond allowable limits. The plaintiff argues that a registration's ongoing validity is unaffected by a change in the person or entity leasing the sign from its owner. Thus, the plaintiff argues, the fact that Foster & Kleiser, which had registered the wall sign in 1973, lost its lease of the wall to Jaguar Company in 1980, and the fact that Jaguar Company thereafter obtained a permit to erect a sign on the wall, does not affect the ongoing validity of the sign's original registration. The plaintiff cites the deposition testimony of multiple witnesses to this effect. The plaintiff further argues that there is no evidence that the sign was ever destroyed, abandoned, discontinued, or removed, and that neither the addition of lighting to the wall nor the change from painting the brick to attaching vinyl

substrate to the wall is a modification beyond allowable limits.

¶ 48     As we find this issue dispositive, we first address whether the plaintiff's ability to rely upon the 1973 registration as the legal basis for it to display a sign in 2014 and thereafter was lost by the change from painting advertising copy directly onto the brick to attaching a vinyl banner to the wall that had advertising copy preprinted on it. It is undisputed that this change occurred sometime in approximately 2000 and that the plaintiff seeks to continue the use of "a computer-generated single substrate piece of vinyl" attached to the wall to display advertising, which is the standard practice in the industry.

¶ 49     We believe that the trial court engaged in the proper analysis of this issue. As it existed on July 1, 1972, the sign at issue was comprised of an advertising message painted directly onto the building's brick wall. Accordingly, the sign that was registered with IDOT in 1973 was described as a "[p]ainted [w]all." It existed as such until approximately 2000, at which time an advertising message was no longer painted directly onto the brick but instead was preprinted onto a vinyl banner or substrate that was then affixed or attached to the wall in some fashion. Under the plain and unambiguous language of the Advertising Control Act, we hold that this constituted the "erection" of a new "sign."

¶ 50     The Advertising Control Act defines "sign" very broadly, to include "any outdoor sign, display, device, notice, figure painting, drawing, message, placard, poster, billboard, or other thing, which is designated, intended, or used to advertise or inform" and visible from the highway. 225 ILCS 440/3.07 (West 2020). It likewise defines "erect" in a broad fashion, as "to construct, build, raise, assemble, *place*, *affix*, *attach*, create, paint, draw or in any other way bring into being or establish." (Emphases added). *Id.* § 3.08. Thus, at the time when a vinyl banner or substrate containing a preprinted advertising message was initially attached to the wall, these broad

definitions were satisfied because a "thing, which is designated, intended, or used to advertise or inform" was "place[d], affix[ed], [or] attach[ed]" upon the surface behind it.

¶ 51    The only way this change would not constitute the "erection" of a sign is if it was "performed as an incident to the change of advertising message or normal maintenance or repair of a sign or sign structure." *Id.* The plain meaning of "incident" as it is used in this statute means "something dependent on or subordinate to something else of greater or principal importance." Merriam-Webster's Collegiate Dictionary 587 (10th ed. 1999). Black's Law Dictionary likewise defines "incident" as "[d]ependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)." Black's Law Dictionary 911 (11th ed. 2019). When the change first occurred from painting the advertising message directly onto the brick itself to attaching or affixing a vinyl banner or substrate with a preprinted advertising message onto the wall, that action was not undertaken merely as an "incident" to the change of advertising message or the normal maintenance or repair of a sign. In other words, when the change from painting the brick to attaching preprinted vinyl initially occurred, the changing of the advertising message was not "something else of greater or principal importance" that was simultaneously occurring. Rather, that initial change from painting the brick to attaching preprinted vinyl to it reflected a substantial change toward a more efficient, faster, and more cost-effective way of displaying, maintaining, and changing an advertising message. Although subsequent substitutions of one preprinted vinyl banner for another would most likely qualify as being "incident" to a change in advertising message, that initial change from painting the wall to hanging preprinted vinyl did not.

¶ 52    We are not persuaded that a different result is required under the cases cited by the plaintiff, which involved signs that sustained damage due to weather or vandalism and were allowed to be reconstructed without requiring a permit or necessarily losing their lawful nonconforming status.

For example, in *Keller Development Corp.*, 122 Ill. App. 3d at 1040, the appellate court held that the prior statutory definition of "erect" did not prevent a preexisting registered sign that had undergone significant damage in a storm from being replaced as part of "normal maintenance or repair," even though the preexisting sign had been "completely removed and no materials from the old sign were used in the construction of the replacement sign." In *Dusty's Outdoor Media*, 2019 IL App (5th) 180269, ¶ 28, the court held that, where a registered sign had been blown over in a windstorm, returning the original uprights to their previous position without substantially altering the sign's condition constituted normal maintenance or repair. And in *Gannett Outdoor of Chicago v. Baise*, 163 Ill. App. 3d 717, 724 (1987), the court held that a nonregistered sign's owner was entitled to a preliminary injunction preventing IDOT's removal of a sign, where municipal authorities, after a change in zoning and a finding that that a sign was unsafe due to vandalism and its presenting a hazard to children, required the sign owner to remove twelve steel beams and replace them with a single pole five feet in diameter.

¶ 53 These cases are of no assistance to the plaintiff because here, the plaintiff makes no argument that the change from paint to vinyl was the result of normal maintenance and repair. There is no evidence that the preexisting registered sign at issue suffered damage from something such as a natural disaster or vandalism or posed a safety hazard, such that the change from painting the wall to attaching preprinted vinyl could be part of normal maintenance and repair. Instead, the change from painting the brick to attaching the vinyl banner appears to have been a voluntary choice toward a more efficient and cost-effective method of doing business.

¶ 54 We are similarly unpersuaded by the plaintiff's reliance on several out-of-state cases. While the case of *Lamar Advantage GP Co. v. City of Pittsburgh Zoning Board of Adjustment*, 244 A.3d 348 (Pa. 2021), did involve the question of whether a vinyl advertising sign could be affixed onto

an electronic billboard without affecting the billboard's lawful nonconforming status, the case did not involve Pennsylvania's statutory analog to our Advertising Control Act. Rather, the case involved the municipal zoning code of the City of Pittsburgh and issues of Pennsylvania zoning law. *Id.* at 355-57. Thus, we find the case unhelpful to the issues before us.

¶ 55    In *Royal Food Systems, Inc. v. Missouri Highway & Transportation Comm'n*, 876 S.W.2d 38, 41 (Mo. Ct. App. 1994), the Missouri Court of Appeals held that a new sign was not erected within the meaning of the analogous Missouri statute where, after a Texaco gas station was purchased and a Wendy's franchise was built on the site, a sign that had spelled out "Texaco" was changed to spell "Wendy's." Noting that the sign's structure and support poles had been left intact and that one six-letter word had been exchanged for another, the court held that the case presented a permissible change in advertising message. *Id.* We find *Royal Food Systems* to be unhelpful to the plaintiff. Unlike the situation in that case, here the change from painting the brick wall to attaching a preprinted vinyl banner to it cannot merely be considered the exchange of one advertising message for another. As we explained above, when this change first occurred it was a more significant change toward a more efficient and cost-effective method of displaying, maintaining, and changing advertising content. It was not a change that was merely "incident to the change of advertising message."

¶ 56    The case of *State of Nebraska, Department of Roads v. World Diversified, Inc.*, 576 N.W.2d 198 (Neb. 1998), involved a sign that was nonconforming only as to the content it was allowed to display. Under Nebraska's grandfather clause, the sign at issue had been permitted to display advertisements for products and services not sold on the premises. *Id.* at 199. After the sign's owners converted it from having a marquee face that required the manual changing of letters to one that displayed messages electronically, the state sought an injunction to prohibit the sign's use

for displaying products or services not sold on-site. *Id.* at 200. The state argued that this change constituted the "erection" of a new sign that resulted in the loss of the sign's grandfathered capacity to advertise off-site products or services. *Id.* at 201. The Nebraska Supreme Court interpreted that state's regulatory definition of "erect," which is materially the same as the Illinois statutory definition prior to 2010, and it concluded that "a new sign would have to be brought into being or established in order to conclude that a new sign had been 'erected.' " *Id.* at 202-03 (citing 410 Neb. Adm. Code, ch. 3, § 002.01E). The court held that in the case before it, the change from a manual marquee display to an electronic display "is akin to a modernization or maintenance of the sign rather than the erection of a new sign." *Id.* at 203.

¶ 57 As a decision from the court of another state interpreting its own state law, *World Diversified* is obviously not binding precedent on this court. *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 82. Despite the similarity of the definitions used in both states, we do not interpret the term "erect" as used in the Advertising Control Act as narrowly as the Nebraska Supreme Court interpreted that state's definition. To the extent *World Diversified* supports the proposition that a preexisting registered sign in Illinois could be "modernized" from the way it existed as of July 1, 1972, without the need for a permit from IDOT, that does not appear to be the law in Illinois. The plain language of the Advertising Control Act allows only for the "normal maintenance or repair" of preexisting registered signs, along with the periodic changing of their advertising messages. 225 ILCS 440/3.06, 3.08 (West 2020). Anything more than this constitutes the "erection" of a sign and requires a permit from IDOT. *Id.* §§ 3.06, 3.08, 8.

¶ 58 The fact that the General Assembly allowed only for the "normal maintenance or repair" of preexisting registered signs or sign structures and for the periodic changing of their advertising messages indicates that its legislative intent in enacting the Advertising Control Act was not to

allow nonconforming registered signs to continue in perpetuity or to be changed from the way they existed at the time of registration. This understanding is further supported by the federal regulations effectuating the Highway Beautification Act, which enable states to allow an existing nonconforming sign to remain "for the duration of its normal life subject to customary maintenance." 23 C.F.R. § 750.707(c) (1976). Additionally, the federal regulations provide that the sign "must remain substantially the same as it was on the effective date of the State law or regulations." *Id.* § 750.707(d)(5). The allowance of only normal maintenance or repair and periodic changing of advertising messages indicates a legislative intent that preexisting signs not conforming to the Act's requirements would be phased out over time. See *Meredith Outdoor Advertising, Inc. v. Iowa Department of Transportation*, 648 N.W.2d 109, 118 (Iowa 2002) ("By permitting only customary maintenance, the obvious purpose of the beautification act was to eventually weed out nonconforming signs").

¶ 59     For these reasons, we hold that the plaintiff is not entitled to rely on the 1973 registration of a sign painted onto the wall of the building as the legal basis for its displaying of advertising at the site in 2014 or thereafter. We conclude as a matter of law that the use of the sign that was registered in 1973 was discontinued approximately 14 years previously, once advertising was no longer painted directly onto the brick wall. The trial court properly granted summary judgment in favor of IDOT and against the plaintiff on this issue, and for this reason we do not need to address the plaintiff's alternative arguments concerning the timing of the sign's illumination.

¶ 60                             B. Plaintiff's right to transfer of Permit 1-1289

¶ 61     The plaintiff's remaining argument on appeal is that the trial court erred in concluding that the plaintiff was not entitled to the transfer of permit 1-1289. The plaintiff argument is that (1) the permit belongs to the sign, not the lessee of the sign, (2) the law did not require the plaintiff to

obtain consent or a signature from Jaguar Company for the transfer of the permit, and (3) Jaguar Company had no legal right to cancel the permit.

¶ 62    The plaintiff cites no legal authority in support of its argument that the permit belongs to the sign. Instead, the plaintiff cites the deposition testimony of three witnesses. First, it cites the testimony of Thomas Walsh, who has been employed in the outdoor advertising industry for over forty years, that "the sign permit runs with the sign" and remains with it until the wall is demolished or abandoned. Walsh further testified that Jaguar Company did not own the right to the permit issued in 1980, but instead the sign rights belonged to and remained with the owners of the wall, as it was the building that had been permitted by IDOT. Second, the plaintiff cites the deposition testimony of Rich Christopher, who was the former deputy counsel for IDOT from 1989 to 2006, that a permit is assigned to the sign itself and is not something that is owned by anyone. Third, the plaintiff cites the testimony of Timothy Hoesli, the outdoor advertising program manager for IDOT, that the permit stays with the sign until the structure is taken down or destroyed.

¶ 63    The trial court rejected the argument that permit 1-1289 belonged to the wall as opposed to the person or entity that owned the sign and obtained the permit, and we agree. The plain language of section 8 of the Advertising Control Act provides that, upon receipt of an application and payment of a fee, IDOT "then issues a permit *to the applicant* for the erection of the sign." (Emphasis added). 225 ILCS 440/8 (West 2020). Thus, "the applicant" is the person or entity to which the permit is issued and that has possession of it thereafter. The permit is not issued to the sign itself, which is not a legal entity. This conclusion is further supported by the part of section 8 providing that, "[u]pon change of sign ownership the new owner of the sign shall notify the Department and supply the necessary information to renew the permit for such sign at no cost within 60 days after the change of ownership. Any permit not so renewed shall become void." *Id.*

The fact that the General Assembly placed a responsibility upon "the new owner of the sign" to "renew the permit" within 60 days of a "change in sign ownership" or have it become void indicates a legislative intent that the permit belongs to the applicant for the permit or the owner of the sign, not to the sign itself.

¶ 64    Thus, Jaguar Company was at all times the owner of permit 1-1289. It was the "applicant" to which the permit had been issued in 1980, and it was the owner of the sign. Section 8 draws a distinction between the "owner of the sign" and the "owner of the land on which the sign is located." *Id.* On the application for permit 1-1289, Jaguar Company was identified as "Owner of Proposed Sign." The building's then-owners were listed as "Owner of Land." Furthermore, this is consistent with the terms of the lease that gave Jaguar Company the right to use the building's wall "for the purpose of erecting and maintaining advertising signs thereon." Having these rights under the lease made Jaguar Company the owner of the "sign," as that term is defined under the Advertising Control Act. *Id.* § 3.07. Also, it was expressly acknowledged in the lease that Jaguar Company would be the party to obtain all necessary outdoor advertising permits from IDOT.

¶ 65    It is appropriate at this point to parenthetically discuss that the building's current owner, Bolech & Zigmond Equity, LLC (BZE), which this court granted leave to file an *amicus curiae* brief, also asserts ownership rights in the sign erected by Jaguar Company and in permit 1-1289. In that *amicus* brief, BZE argues that, as the building's owner, it had a vested property right in the ongoing permitted use of the sign under permit 1-1289. It also argues that it has a common law property interest in the sign as a fixture on its property and in the permit joined to that erected sign. Finally, it argues that recognizing a lessee of advertising space as the owner of the sign and permit, as opposed to the property owner, would give a lessee such as Jaguar Company "the equivalent of a perpetual lease."

¶ 66 Notwithstanding the plain language of the statute and the terms of Jaguar Company's lease, the biggest problem with BZE's arguments asserting its own rights in the permit or sign is that they are improperly raised in an *amicus* brief. An *amicus curiae* is not a party to an action but rather acts as a "friend" of the court. *In re J.W.*, 204 Ill. 2d 50, 73 (2003). The sole function of an *amicus curiae* is to advise or make suggestions to the court. *Id.* Importantly, an *amicus* takes the case as he or she finds it, with the issues as they were framed by the parties. *Id.* Courts need not pass on grounds for reversal urged solely by an *amicus*. *People v. P.H.*, 145 Ill. 2d 209, 234 (1991).

¶ 67 If BZE was of the belief that it had a vested right in the continuation of permit 1-1289 once its lease with Jaguar Company terminated or a property interest in the sign and permit as a fixture to its real property, we fail to see why BZE did not intervene as a party in the trial court to protect its purported interests and to assert these arguments where they could have been tested through the adversarial process and passed upon by the trial court. See 735 ILCS 5/2-408 (West 2020). Having failed to do this, we will not pass on arguments raised for the first time on appeal by a non-party in an *amicus* brief. See *P.H.*, 145 Ill. 2d at 234.

¶ 68 Returning to the fact that Jaguar Company was the possessor of permit 1-1289 and the owner of the sign that was erected pursuant to that permit, Jaguar Company had the right to choose what to do with that permit and sign once it no longer had rights under the lease to maintain a sign on the building's west wall. Among its options were to transfer its ownership interest in the permitted sign to a new owner or to do nothing and effectively abandon the permit. Concerning the option to transfer ownership of the permitted sign to a new owner, section 8 of the Advertising Control Act provides in pertinent part as follows:

> "Upon change of sign ownership the new owner of the sign shall notify the Department and supply the necessary information to renew the permit for such sign at no

- 30 -

cost within 60 days after the change of ownership. Any permit not so renewed shall become void." 225 ILCS 440/8 (West 2020).

Likewise, the applicable IDOT regulation provides as follows:

"Upon a change in permittee or sign ownership, the new permittee or owner of the sign shall notify the Department, in writing, of the sign permit or registration number and the old and new permittee or sign owners' names within 60 days after the change in permittee or sign ownership. No application fee is required under these circumstances. Any permit or registration not so renewed shall become revocable in accordance with the provisions of Subpart C. (Section 8 of the Act)." 92 Ill. Adm. Code § 522.90(b), amended at 35 Ill. Reg. 8523 (eff. May 17, 2011).

¶ 69   The plain language of this statute and regulation contemplates a "change" in the permittee or in the ownership of an existing sign that was erected pursuant to a permit and that, if such a change occurs, the existing permit will be renewed in the name of the new sign owner or permittee. By contrast, if the existing sign that was erected pursuant to the permit is removed or destroyed, a new permit would be required to erect a new sign at the same site. The latter situation is not a "change" in the permittee of an existing permit or in the ownership of an existing sign.

¶ 70   Accordingly, we reject the plaintiff's argument that it was entitled to obtain the transfer of existing permit 1-1289 without obtaining the signature from a representative of Jaguar Company certifying that there had been a change in permittee or sign ownership. IDOT's letter to the plaintiff stated that it was denying the transfer of permit 1-1289 on the basis that the plaintiff had not provided either such a signature from Jaguar Company or an agreement between the plaintiff and Jaguar Company showing a transfer of ownership. We find that requiring the signature of the record owner confirming transfer is reasonably within the "necessary information" that IDOT may

require to renew or transfer a permit. 225 ILCS 440/8 (West 2020).

¶ 71     It is obvious that the plaintiff's true complaint is not with the signature requirement itself, but rather that the consent of Jaguar Company is a requirement for a "change in permittee or sign ownership" to exist. However, as we have discussed above, Jaguar Company was the owner of the existing sign and the entity in possession of the permit under both the statute and the terms of its lease with the building's owners. As such, its agreement was necessary for there to be a change in the ownership of the existing sign or a change in the permittee of permit 1-1289. If Jaguar Company refused to agree to such a change and instead elected to abandon the permit and remove the existing sign at the end of its lease term, the plaintiff had no right under the statute or regulation to compel IDOT to renew or transfer permit 1-1289 to the plaintiff.

¶ 72     The plaintiff's final argument is that Jaguar Company had no legal right to cancel the permit. As discussed above, we conclude that Jaguar Company, at the conclusion of its lease, had the right not to agree to a change in ownership of its existing sign or the permit it had obtained to erect and maintain that sign. Instead, it had the right to do nothing and effectively abandon the permit. One of the conditions for a permit is the existence of a valid site lease, which Jaguar Company no longer had after November 15, 2014. See 92 Ill. Adm. Code § 522.50(b)(5), amended at 35 Ill. Reg. 8523 (eff. May 17, 2011). It also appears undisputed that the existing sign failed to meet the size and spacing requirements allowable under the Advertising Control Act and regulations. See 225 ILCS 440/6.01, 6.03(b) (West 2020); 92 Ill. Adm. Code § 522.200(a), (d), amended at 22 Ill. Reg. 7262 (eff. April 9, 1998). It was for these reasons that IDOT revoked the permit without any objection from Jaguar Company. Thus, although we agree with the trial court's assessment that Jaguar Company appears to have engaged in "scorched-earth" tactics with respect to a business competitor, the plaintiff has not shown that that Jaguar Company acted outside of its legal rights

by doing what it did.

¶ 73                                    III. CONCLUSION

¶ 74          For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 75          Affirmed.